**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DOREL STEEL ERECTION CORPORATION | : | |
| | : | |
| vs. | : | C.A. No:. 05-10627-WGY |
| | : | |
| CAPCO STEEL CORPORATION | | |
| | | |
| and | : | |
| | : | |
| CANAM STEEL CORPORATION | | |
| Reach and Apply Defendant | : | |

## MEMORANDUM IN SUPPORT OF DEFENDANT, CAPCO STEEL CORPORATION'S MOTION TO DISMISS

### I. PREAMBLE

Defendant, Capco Steel Corporation and plaintiff, Dorel Steel Erection Corporation entered into a "Memorandum of Understanding" on July 19, 2001 in relation to a project known as "Boston Convention and Exhibition Center." The "Memorandum of Understanding" included two other parties, James F. Sterns Company and Prime Steel Corporation. In its complaint, Dorel Steel Erection Corporation seeks an action for breach of contract (Count I), quantum meriut (Count II) and reach and apply (Count III). Dorel Steel Erection Corporation is seeking an accounting from Capco Steel Corporation relative to monies it claims are due under the "Memorandum of Understanding." (See Exhibit A). Capco Steel Corporation was designated as the administrative project manager under the agreement. In this capacity, Capco Steel Corporation was responsible for bookkeeping, payroll and billing among other administrative responsibilities.

The "Memorandum of Understanding" contains Section 12.9 entitled "Governing Law" which states as follows:

This Agreement shall be construed and enforced in accordance with the laws of the

i

State of Rhode Island. In any litigation connected with this Agreement, the parties hereto hereby consent to and confer jurisdiction on the courts of the State of Rhode Island, United States of America and on the United States District Court for the District of Rhode Island, and hereby expressly waive any objections to venue in any such courts. THE PARTIES HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION THEREWITH.

## II. ARGUMENT

A.     MOTION TO DISMISS.

When a party seeks to have a case brought in another jurisdiction based on a forum selection clause in a contract, this neither addresses the court's venue or the court's subject matter jurisdiction. Rather, the motion is properly labeled as a 12(b)(6) motion to dismiss for failing to state a claim upon which relief can be granted. See, LFC Lessors, Inc. v. Pacific Sewer Maintenance Corporation, 739 F.2d 4, (1st Cir. 1984); Lambert v. Kysar, 983 F.2d 1110 (1st Cir. 1993).

B.     THE MEMORANDUM OF UNDERSTANDING DATED JULY 19, 2001 CONTAINS A CHOICE OF LAW PROVISION UNDER SECTION 12.9 WHICH REQUIRES THAT THE AGREEMENT BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF RHODE ISLAND.

The choice of law provision under Section 12.9 of the agreement dated July 19, 2001 provides in relevant part that, "This agreement shall be construed and enforced in accordance with the laws of the State of Rhode Island." This agreement was signed by plaintiff, Dorel Steel Erection Corporation, and by defendant, Capco Steel Corporation. There is no dispute in this case that Rhode Island law applies to the interpretation, enforcement and to any right and/or obligation arising under the agreement.

Under Rhode Island Law, parties can select the law of the jurisdiction that will govern their transaction as long as there is a reasonable basis for choosing the law of the particular jurisdiction

which includes satisfying one of the following elements:

1.    Was the jurisdiction selected the place of performance of one of the parties;

2.    Was the jurisdiction selected the domicile of one of the parties; or

3.    Was the jurisdiction selected the principal place of business of one of the parties.

See, Sheer Asset Management Partners v. Lauro Thin Films, Inc., 731 A.2d 708, 710 (R.I. 1999).

Capco Steel Corporation is a Rhode Island corporation with its principal place of business located in Providence, Rhode Island. Capco Steel Corporation manufactures steel at its location in Providence, Rhode Island.

It is undisputed that there was a reasonable basis to select Rhode Island as the law that would govern the contract that was entered into in this case.

C.    THE FORUM SELECTION CLAUSE CONTAINED IN SECTION 12.9 OF THE MEMORANDUM OF UNDERSTANDING DATED JULY 19, 2001 EXPLICITLY AND UNAMBIGUOUSLY MANDATES THAT ANY LITIGATION ARISING OUT OF THE AGREEMENT BE BROUGHT IN EITHER STATE AND/OR FEDERAL COURT IN RHODE ISLAND.

The forum selection clause in Section 12.9 provides in full that:

> In any litigation connected with this Agreement, the parties hereto hereby consent to and confer jurisdiction on the courts of the State of Rhode Island, United States of America and on the United States District Court for the District of Rhode Island, and hereby expressly waive any objections to venue in any such courts.

When a lawsuit is filed in Massachusetts and the issue involves a forum selection clause, courts in Massachusetts will apply the law as selected by the parties to determine the enforcement of the forum selection clause in the contract. See, Jacobson v. Mail Boxes, Etc., 419 Mass. 572, 646 N.E.2d 741 (1995). In Jacobson, a franchise agreement provided that California law would govern

the construction of the agreement. *Id* at 743. The agreement also contained a forum selection clause which required all action arising out of the agreement to be pursued in San Diego, California. *Id*. The court applied the law of California to construe the forum selection clause and to determine whether the provision was reasonable and enforceable. *Id* at 744. See also, Lambert v. Kysar, 983 F.2d 1110 (1st Cir. 1993).

Thus, this court has to look to the law of the State of Rhode Island as to the interpretation of the forum selection clause and whether the clause is valid and enforceable under Rhode Island Law.

In deciding whether the parties intended to bind themselves to a particular forum or jurisdiction, courts in Rhode Island will employ the same standard as utilized to interpret contracts. See, DeCesare v. Lincoln Benefit Life Company, 852 A.2d 474, 482 (R.I. 2004). "If a contract is clear and unambiguous, the meaning of its terms present a question of law for the court. [I]n determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language must be given its plain, ordinary and usual meaning." See, Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996). A contract is only ambiguous if it is reasonably and clearly susceptible to more than one interpretation. See, Rubery v. Downing Corporation, 760 A.2d 945, 947 (R.I. 2000). When a contract is unambiguous, the intent of the parties is irrelevant. See, Hilton v. Fraioli, 763 A.2d 599, 602 (R.I. 2000).

The forum selection language contained in Section 12.9 of the agreement is clear and unambiguous. The agreement states that "any litigation connected with this agreement" "the parties hereto hereby consent to and confer jurisdiction on the courts of the State of Rhode Island," and "hereby expressly waive any objections to venue in any such courts." This language is clear and unambiguous.

iv

In the seminal case on forum selection clauses decided by the United States Supreme Court in 1972 in the case of M/S Bremen v. Zapata Off-Shore Company, 407 U.S. 1, 92 S.Ct. 1907, 32 L.E.2d 513 (1972), the Supreme Court construed the validity of the following clause in a contract, "Any dispute arising must be treated before the London Court of Justice." *Id* at 2. The Supreme Court held that the forum selection clause was mandatory and all encompassing and that the clause would be enforced absent a showing that the forum selection clause was unreasonable, unjust or invalid based on fraud or overreaching conduct. *Id* at 16, 20.

Under Rhode Island Law, forum selection clauses are *prima facie* valid and the party claiming that such a clause is fundamentally unfair and/or invalid bears a heavy burden of proof. See, Tateosian v. Celebrity Cruise Services, Ltd., 768 A.2d 1248, 1250 (R.I. 2001). A forum selection clause is not unreasonable simply because a party has to travel to a nearby state and/or litigation costs may be increased. Simply showing that another location is more convenient does not sustain ones burden. "Were it otherwise, forum selection clauses would almost never be enforceable, for inconvenience to at least one of the parties is an almost foregone conclusion when dealing with a provision that requires litigating away from one's home turf." See, Mercurio v. Wright Medical Technology, Inc., 402 F.3d 62, 66 (1st Cir. 2005). The standard governing whether a forum selection clause is unreasonable requires much more than inconvenience. "At the time these contracts are entered into, the parties routinely, voluntarily and knowingly agree to litigate and/or be bound by the decision of fora located in distant locations. Thus, something considerably more than the mere inconvenience of traveling to litigate in a different, even far away foreign jurisdiction, is required to overcome a contractual agreement to do so. *Id.*

The forum selection clause does not merely require a party to submit to the jurisdiction of

v

the State of Rhode Island, which without any other language might be construed as permissive and not mandatory but contains additional language rendering it exclusive. See, Shoppes Limited Partnership v. Conn, 829 So.2d 356 (Fla. D.C.A. 2002), see also, K&V Scientific Company, Inc. vs. Bayerische Motoren Werke Aktiengesellschaft, 314 F.3d 494 (10th Cir. 2002).

The forum selection clause contains mandatory language and not permissive language. Section 12.9 of the agreement provides that Rhode Island courts have jurisdiction for "any litigation" connected with the agreement and the parties "expressly waive" any objections to venue in any such courts. If the parties were allowed to bring suit in any other jurisdiction, there would be no reason to state that objections to venue are waived. This language clearly supports that the forum selection language was intended to be mandatory and not permissive. Accordingly, this court should refrain from exercising jurisdiction in this case.

## III. CONCLUSION

For the foregoing reasons, this court should grant defendant's motion to dismiss. This action should be dismissed without prejudice. Plaintiff can pursue this action in the state or federal courts in Rhode Island as designated by the parties in their contract. Plaintiff is bound by the forum selected.

Defendant,
**CAPCO STEEL CORPORATION**
By their Attorneys,

Girard R. Visconti (BBO #510200)
David M. Campbell (BBO# 645512)
*Visconti & Boren Ltd.*
55 Dorrance Street
Providence, RI 02903
(401) 331-3800
(401) 421-9302 Fax

vi

## CERTIFICATION

I, the undersigned, hereby certify that on the 6th day of ___June___, 2005, I mailed a true copy of the within document by regular, first-class mail postage prepaid, to the following:

Charles A. Roberts, Esq.
Law Offices of Scott W. Wynn
254 Main Street
P.O. Box 290009
Charlestown, MA 02129

Michael D. Vhay, Esq.
DLA Piper Rudnick Grary Cary US LLP
One International Place, 21st Floor
Boston, MA 02110



**EXHIBIT**

A

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (the "Memorandum"or the "Agreement") is entered into and shall be effective as of the _/ 9₄₄_ day of _July_ _____, 2001, by and among **Capco Steel Corporation,** a Rhode Island corporation with its principal place of business at 33 Acorn Street, Providence, RI 02903 ("Capco"); **Dorel Steel Erection Corporation,** a Massachusetts corporation with its principal place of business at 33 Fayette Street, Quincy, Massachusetts 02171 ("Dorel"); **James F. Stearns Company,** a _Massachusetts_ _____ corporation with its principal place of business at 35 Pond Park Road, Hingham, Massachusetts 02043 ("Stearns"); and **Prime Steel Corporation,** a _____ corporation with its principal place of business at 7 Sullivan Road, North Billerica, Massachusetts 01862 ("Prime").

WHEREAS, Canam Steel Corporation, a _____ corporation having a principal place of business located at P.O. Box C-285, 4010 Clay Street, Point of Rocks, Maryland 21777 ("Canam" or the "Prime Steel Contractor"), as subcontractor, has entered into that certain subcontract agreement dated _____ (the "Clark/Huber Subcontract") with Clark/Huber, Hunt & Nichols/Berry, A Joint Venture, having a principal place of business located at 420 D Street, Boston, Massachusetts 02210 ("Clark/Huber"), as general contractor, concerning the structural steel, metal deck, metal stairs and railings and catwalks, and related work for that certain construction project located at _____, Boston, Massachusetts and known as "Boston Convention and Exhibition Center" (the "Project"), such work having a current value of approximately Eighty Nine Million Seven Hundred Thousand Dollars ($89,700,000).

WHEREAS, Capco and Canam have entered into that certain subcontract agreement dated _____, 2001 concerning certain portions of the structural steel and related work for the Project, a copy of which is attached hereto and made a part hereof as EXHIBIT A (the "Prime Agreement").

WHEREAS, pursuant to the Prime Agreement, Canam (as prime steel subcontractor for the Project) has subcontracted to Capco certain aspects of the structural steel and related work for the Project, such work having a current value of approximately Thirty Five Million Dollars ($35,000,000).

WHEREAS, Capco desires to enter into a sub-subcontract arrangement with Dorel respecting certain aspects of the structural steel and related work for the Project to be performed under the Prime Agreement, such work having a current value of approximately Eight Million Seven Hundred Fifty Thousand Dollars ($8,750,000), and Canam has acknowledged and agreed to such sub-subcontract arrangement (together with this Memorandum of Understanding and the sub-subcontract arrangements with Stearns and Prime, the "Subcontracts").

         _& Dorel Stl_

WHEREAS, Capco desires to enter into a sub-subcontract arrangement with Stearns respecting certain aspects of the structural steel and related work for the Project to be performed under the Prime Agreement, such work having a current value of approximately Eight Million Seven Hundred Fifty Thousand Dollars ($8,750,000), and Canam has acknowledged and agreed to such sub-subcontract arrangement (together with this Memorandum of Understanding and the sub-subcontract arrangements with Dorel and Prime, the "Subcontracts").

WHEREAS, Capco desires to enter into a sub-subcontract arrangement with Prime respecting certain aspects of the structural steel and related work for the Project to be performed under the Prime Agreement, such work having a current value of approximately Eight Million Seven Hundred Fifty Thousand Dollars ($8,750,000), and Canam has acknowledged and agreed to such sub-subcontract arrangement (together with this Memorandum of Understanding and the sub-subcontract arrangements with Dorel and Stearns, the "Subcontracts").

WHEREAS, notwithstanding the foregoing, and in full recognition of the above subcontract arrangement, the parties hereto agree and acknowledge that performance of the services to be rendered under the Prime Agreement by Capco and under the Subcontracts by Dorel, Stearns, and Prime shall be most efficiently, economically, and expeditiously accomplished based on a coordinated and joint effort of the parties hereto, with the parties sharing equally in the performance, substantive decision making, scheduling, profits and losses, and risks and rewards related to the services to be provided under the Prime Agreement, and that the nature and manner of said coordinated effort of the services to be provided under the Prime Agreement, and the respective responsibilities, interests, and liabilities of the parties in connection therewith, have been set forth in this Memorandum, as supplemented by the provisions of SCHEDULE 1 attached hereto and made a part hereof.

NOW THEREFORE, in consideration of the foregoing, of the mutual covenants and promises contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows.

1. Relationship of Parties. The relationship of the parties shall be as independent contractors, and shall not be considered or deemed to be that of joint venturers, partners, employer/employee, principal/agent, or any other association whatsoever, and neither party shall have the power to bind or obligate the other except as specifically set forth herein. No party hereto shall have any authority, by reason of this Agreement or the relationships created hereby, to hold itself out as a general agent or partner of another party. The parties hereby acknowledge and agree that each may engage in any activity whatsoever (as an owner, agent, consultant, or otherwise) in addition to the Project.

2. Definitions. When used in this Agreement the following capitalized words and phrases shall have the following meanings:

2.1. "Agreement" means this Memorandum of Understanding, including each exhibit and schedule attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

2.2. "Bankruptcy" means, with respect to any Person, the occurrence of any one or more of the following events: (i) the making by such Person of an assignment for the benefit of creditors; (ii) the filing by such Person of a voluntary petition in bankruptcy; (iii) the entry of any order adjudicating such Person a bankrupt or insolvent; (iv) the filing by such Person of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (v) the filing by such Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of such nature; (vi) the seeking of, consenting to, or acquiescing in, by such Person, the appointment of a trustee, receiver, or liquidator of such Person or of all of any substantial part of such Person's properties; (vii) the expiration of One Hundred Twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, if such proceeding has not theretofore been dismissed; or (viii) the expiration of Ninety (90) days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties, if the appointment has not theretofore been vacated or stayed; or the expiration of Ninety (90) days after the expiration of any stay, if the appointment has not theretofore been vacated.

2.3. "Consent of the Parties" means the written consent or approval of the majority in number of the parties hereto.

2.4. "Person" means any individual, partnership (whether general or limited), limited liability company, corporation, association, trust, estate, custodian, nominee, or other entity, in its own or any representative capacity.

2.5. "Prime Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

2.6. "Project" has the meaning set forth in the introductory paragraphs of this Agreement.

2.7. "Subcontract(s)" has the meaning set forth in the introductory paragraphs of this Agreement.

2.8. "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or other disposition and, as a verb, voluntarily to transfer, sell, pledge or otherwise dispose of property, assets, or items.

3. Labor, Materials, and Resources. Each party agrees to contribute to the services to be performed under the Prime Agreement an equal share of the labor, materials, and resources necessary to complete the services to be provided under the Prime Agreement, all as further described in the schedule of labor, materials, and resources attached hereto and made a part hereof as EXHIBIT B (the "Schedule"), as the same may be amended from time to time by the Consent of the Parties; provided, however, that all laborers on the Project pursuant hereto or pursuant to the Prime Agreement shall solely be employees of Capco. Modifications to the Schedule may be recommended by the Project Manager, as such term is defined in *Section 4.2* hereof, and shall be considered for all purposes hereof to be approved by the parties unless at least a majority in number of the parties, after written notice of such recommendation, promptly object in writing thereto.

3.1. It is anticipated that the contributions of labor, materials, and resources hereunder will be required in accordance with the so-called critical path method. A copy of the critical path thereunder (the "Critical Path") shall be incorporated into the Schedule.

4. Management. The management of the coordinated and joint services to be provided by the parties hereunder as related to the Prime Agreement, except where explicitly provided otherwise herein, shall be based on the Consent of the Parties. Except as otherwise expressly provided in this Agreement, any action or vote taken, or any decision made, hereunder shall be by the Consent of the Parties. No meeting, formal or informal, shall be required by the parties to act. All of the parties shall cooperate with each other to do all things necessary and incidental to the completion of the Project in accordance with the Prime Agreement and the Subcontracts.

4.1. Authorized Representatives. Each party designates the following representative to exercise its right to consent on any matter submitted for consent or approval hereunder or as otherwise related to the Project:

| | |
|---|---|
| (i) Capco: | Michael Caparco, Sr. |
| (ii) Dorel: | John D. Murphy, Jr. |
| (iii) Stearns: | James Stearns. |
| (iv) Prime: | Richard Long |

Each party may at any time substitute an alternate representative in place of its above-named representative by delivering written notice thereof to all of the other parties. Each party's

representative or alternate representative is hereby granted and shall hereafter possess authority
to act for such party on all matters of interest to it with respect to its participation hereunder.

4.2. Project Manager. The parties shall appoint a project manager (the "Project
Manager") who, subject to this Agreement and to the direction and control of the parties by
Consent of the Parties, shall be in charge of managing and directing the day-to-day respective
and collective contributions of labor, materials, and resources on the Project site by the parties in
accordance with the Schedule and in the performance of the Prime Agreement. The Project
Manager shall hold office for such term as determined by, and may be removed with or without
cause by, the Consent of the Parties. The parties agree and acknowledge that the initial Project
Manager shall be Michael Cushing.

4.3. Administrative Project Manager. The parties designate Capco as the
administrative project manager hereunder (the "Administrative Project Manager"). In such
capacity, the Administrative Project Manager shall, subject to this Agreement, be responsible for
all bookkeeping, payroll, billing, filing, and other administrative duties set forth herein, and for
the performance of all ministerial acts and duties relating to the payment of all indebtedness,
taxes, and expense due or to become due in respect of the Project as contemplated hereunder and
under the Prime Agreement. The Administrative Project Manager shall hold office until and
unless removed by the unanimous consent of the parties hereto, other than the party proposed to
be so removed, for "cause" as such term is defined herein.

4.3.1. For purposes of this Section 4.3, the term "for cause" shall mean
and refer to a reasonable belief, articulated and described in sufficient detail so as to adequately
notify the party to be charged of the nature and cause of such belief, that the Administrative
Project Manager has engaged in any wilful breach of fiduciary obligations, provided that the
Administrative Project Manager shall first be provided with no less than Thirty (30) days prior
written notice and opportunity to cure such alleged conduct.

4.3.2. The Administrative Project Manager shall receive compensation for
serving as Administrative Project Manager in accordance with the schedule of compensation
attached hereto and made a part hereof as EXHIBIT C. The Administrative Project Manager
shall also be reimbursed for all expenses incurred by it directly attributable to the performance of
its duties hereunder within Thirty (30) days of the receipt of payment from Canam associated
therewith or applicable thereto.

5. Insurance. The Administrative Project Manager shall procure and maintain, or cause
to be procured and maintained, insurance sufficient to enable the parties to comply with
applicable laws, regulations, and requirements respecting their performance of services hereunder
on the Project in accordance with the Prime Agreement, including but not limited to such
liability, casualty, or other insurance as may be required under the Prime Agreement and such
surety bonds (and related indemnity agreements) as may be required under the Prime Agreement

J:\SHARED\LAWYER\JN\Capco re Boston Conv\Memo of Understanding (8-6-01).wpd

- 5 -

and as is customary for projects such as the Project. The Administrative Project Manager shall furnish to the parties, at such times as the parties may reasonably request, a schedule of such insurance and bonding, and copies of certificates evidencing the same.

     6. <u>Books and Records</u>. The Administrative Project Manager shall maintain at its principal place of business a separate book of accounting for the Project that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the Prime Agreement. The Administrative Project Manager shall use such method of accounting in preparation of its financial reports respecting the Project and for tax purposes respecting the Project as it shall reasonably determine, and the Administrative Project Manager shall keep such book accordingly. Any party, through its designated representative, shall have the right at any reasonable time and with reasonable prior notice to have access to and inspect and copy the contents of such book. The Administrative Project Manager shall prepare and furnish to each party a summary financial statement regarding such record, no less frequently than *Monthly* , within Twenty (20) days after the close of each *Monthly* during the term hereof.

     6.1. <u>Audit</u>. Upon final completion of the Project, a final audit shall be made by the Administrative Project Manager's independent accountants, and copies of such audit shall be furnished to each of the parties.

     6.2. <u>Accounts and Temporary Investments</u>. All funds received by Capco under the Prime Agreement shall be deposited in such checking accounts, interest bearing savings accounts, interest bearing time deposits, interest bearing certificates of deposit, or like investment vehicles, in Capco's name, as Capco shall reasonably determine; provided, however, that any such accounts or investment vehicles shall be maintained separately from any other accounts of Capco. Withdrawals from such accounts shall be made only in accordance with the terms hereof. Copies of monthly bank statements shall be distributed to all parties promptly upon receipt.

     6.3. <u>Payroll Account</u>. The Administrative Project Manager shall designate an account established as provided in <u>Section 6.2</u> above for the purpose of payroll for the Project and all withholding taxes and other applicable amounts in connection therewith for services performed by Capco employees related hereto, to the Project, and/or to the Prime Agreement.

     7. <u>Profits, Losses, and Distributions</u>.

     7.1. Unless otherwise specifically agreed by Consent of the Parties, the parties agree that distributions hereunder prior to final completion of the Project shall be made in the form of reimbursements for expenses in accordance with EXHIBIT B. Each party shall provide written request for reimbursement in accordance with EXHIBIT B to the Administrative Project Manager, along with such supporting documentation as the Administrative Project Manager shall reasonably require, no later than Ten (10) days from the close of each *Quarter*

during the term hereof. Such distributions shall be made within Thirty (30) days of the receipt of payment by Capco from Canam corresponding with such reimbursement.

7.2. Unless otherwise specifically agreed by Consent of the Parties, the parties agree that no Profits, as defined herein, derived hereunder or under the Prime Agreement shall be distributed until final completion of the services to be provided hereunder and under the Prime Agreement, and until completion and approval, by the Consent of the Parties, of the final audit described in *Section 6.1.* For purposes hereof, the term "Profits" shall mean the net income earned by Capco (including established Reserves as defined herein) under the Prime Agreement determined in accordance with generally accepted accounting principles (GAAP).

7.2.1. Notwithstanding anything herein to the contrary, the parties agree and acknowledge that Reserves may be set aside by Capco at the time of final completion of the services to be provided hereunder and under the Prime Agreement in such amounts and for such time periods as Capco may reasonably determine; provided, however, that Reserves shall in no event be held beyond _Sixty_ (60) days from the date of final completion of the services to be provided hereunder and under the Prime Agreement. For purposes hereof, the term "Reserves" shall mean amounts or funds set aside hereunder and in accordance with the terms hereof in such amount as shall be reasonably determined by Capco to be necessary or appropriate, but in no event to exceed _*_ Dollars ($ _*_ ), representing reserved funds specifically set aside for any claims, potential claims, retainage, or additional expenditures which may become due or payable as related hereto or to the Prime Agreement subsequent to final completion of the services to be provided hereunder and under the Prime Agreement.

7.3. The parties agree that in the event of any shortfall or Losses arising out of the performance of the of the services to be provided hereunder and under the Prime Agreement, each party shall assume and promptly pay its pro rata share, based on the fraction in which the numerator is one and the denominator is the total number of parties hereto, of such shortfall or Losses to the Administrative Project Manager on or before the date set by the Consent of the Parties and contained in a written notice to the parties; provided, however, that in no event shall such date be later than the latest date on which Capco can avoid a default or event of default under the Prime Agreement. For purposes hereof, the term "Losses" shall mean such shortfall as may be created to the extent that the costs and expenditures hereunder or under the Prime Agreement exceed the amounts earned by Capco from Canam under the Prime Agreement determined in accordance with generally accepted accounting principles (GAAP). The liability for Losses contemplated herein specifically includes losses based on any agreements to indemnify a surety company or surety companies entered into by Capco and relating to the Project and the services to be provided hereunder and under the Prime Agreement.

8. Events of Default.

*= as mutually agreed to by the Parties.

J:\SHARED\LAWYER\JN\Capco re Boston Conv\Memo of Understanding (8-6-01).wpd

- 7 -

8.1. The occurrence of any One (1) or more of the following events shall constitute an "Event of Default" hereunder:

8.1.1. A party shall be or become the subject of a Bankruptcy, as herein defined.

8.1.2. A party shall fail to honor or perform any covenant or obligation hereunder or as required under the Subcontracts or the Prime Agreement, specifically including but not limited to a failure to participate in Project meetings, Project status conferences, or other like meetings respecting the progress of the work to be performed under the Prime Agreement, or a failure to comply with the terms of EXHIBIT B hereof, including the Project schedule and/or the Critical Path.

8.1.3. Reserved.

8.1.4. There shall be any change in the majority ownership or control of any party, or any party shall be dissolved, sold, merged, or otherwise discontinued as to existence, or the occurrence of the filing of a certificate of its dissolution or the equivalent under relevant state law or the administrative or judicial dissolution of any party and the lapse of Thirty (30) days after notice to the corporation of such dissolution without reinstatement, or any party shall sell all or substantially all of its assets; provided, however, that no Event of Default shall have occurred hereunder upon any change in the majority ownership or control of any party if in the reasonable judgment of the remaining parties, arrived at in good faith and fair dealing and memorialized in writing by all of the parties excepting the party subject to such change, said change of majority ownership or control shall not have any material adverse impact on the ability of such party to perform its obligations hereunder.

8.1.5. Any party shall fail to make any required contribution pursuant to *Section 3* hereof on or before the date established by the Consent of the Parties for such contribution, or pursuant to *Section 7.3* hereof on or before the date established therein.

8.2. Notwithstanding the foregoing, in the event of any default under *Section 8.1.2* hereunder, the defaulting party shall first be provided by the non-defaulting parties with no less than Ten (10) days prior written notice and opportunity to cure such default, with said notice articulated and described in sufficient detail so as to adequately notify the party to be charged of the nature of such default.

9. Remedies upon Event of Default. Upon the occurrence of an Event of Default, and the expiration of any applicable cure or grace period, if any, hereunder, the following remedies shall accrue to the non-defaulting parties.

9.1. The defaulting party, without requirement of further action or execution by any Person, shall immediately be deemed to have been removed as a party hereto and to have forfeited any right that it may have to provide services hereunder, under the Prime Agreement, or otherwise as related to the Project.

9.2. The defaulting party, without requirement of further action or execution by any Person, shall forfeit its interest in and right to any Profits hereunder and shall immediately be and become obligated to the other parties for all liabilities, costs, fees, and damages incurred by any or all of the non-defaulting parties as a result of or arising from such default hereunder, under the applicable Subcontract, or otherwise respecting the Project including but not limited to: (a) any delay costs, delay damages, or other damages due to Canam, or the general contractor, owner, or architect for the Project; (b) any increased costs of performance, including extended overhead, and any additional costs arising from delays caused by the defaulting party or work improperly performed by the defaulting party; (c) any costs related to warranty work or other rework, repeat work, or repair work; (d) damages or liability due to third parties; (e) reprocurement costs and excess reprocurement costs; (f) consultants' fees and costs; and (g) attorneys fees costs, costs of collection, and related costs.

9.3. Each defaulting party, upon the occurrence of an Event of Default hereunder, does hereby appoint each non-defaulting party as the defaulting party's attorney-in-fact with full power and authority, for and on behalf of the defaulting party and in such defaulting party's name, place, and stead, to sign, acknowledge, swear to, and deliver all documents and instruments that the remaining parties, in their sole and absolute discretion, determine may be necessary or desirable to effect the Transfer, in whole or in part, of such party's interest hereunder, or such party's interest in all existing sub-subcontracts and purchase orders made by such defaulting party, if any, related to the services hereunder. The foregoing power of attorney is a special power of attorney coupled with an interest, shall be irrevocable, and shall survive the Bankruptcy, insolvency, dissolution, or cessation of existence of a defaulting party. Notwithstanding the foregoing, each party hereby covenants and agrees that if such party becomes a defaulting party hereunder, such party will take such actions and execute such instruments of transfer and other instruments and documents as the remaining parties may determine to be necessary or appropriate to further evidence and confirm the Transfer of such defaulting party's interest hereunder. A defaulting party shall also take such actions as may be necessary or as the non-defaulting parties may request to preserve and protect the work performed hereunder, and upon request of the non-defaulting parties shall terminate all existing sub-subcontracts and purchase orders made by such defaulting party, if any, related to the services hereunder.

9.4. Each defaulting party shall indemnify and hold harmless the non-defaulting parties, and their heirs, executors, administrators, successors, assigns, representatives, directors, officers, shareholders, managers, members, owners, principals, partners, employees, servants, agents, affiliates, parent companies, and subsidiaries, jointly and severally, from and

against all costs, expenses, and damages (including, without limitation, reasonable attorneys fees and expenses) that any of such indemnified Persons may incur as a result of such defaulting party's failure to make a mandatory contribution pursuant to *Section 3 and/or Section 7.3* hereof, including the amount of any Losses so incurred.

10. Indemnification.

10.1. The parties agree that in the event that any party shall sustain a liability based on Losses hereunder in an amount which is in excess of its pro rata share (calculated using the fraction in which the numerator is one and the denominator is the total number of parties hereto), then the other parties shall indemnify such party to the extent of any such excess such that each party shall have paid and sustained its proportionate share of any Losses based on the above fractional calculation.

10.2. The parties agree that in the event that Capco shall sustain a liability based on Losses hereunder or otherwise under the Prime Agreement in an amount which is in excess of its pro rata share (calculated using the fraction in which the numerator is one and the denominator is the total number of parties hereto), then the other parties shall indemnify Capco to the extent of any such excess such that each party shall have paid and sustained its proportionate share of any Losses based on the above fractional calculation.

11. Representations and Warranties. Each party hereby represents and warrants to the others, as a material inducement for the other parties to enter into this Agreement, as follows:

11.1. Organization and Authority. Each party is an entity duly organized, validly existing, and in good standing under the laws of its jurisdiction and is duly qualified to conduct business in the jurisdiction where the Project is located. Each party has all requisite power to own its property and to carry on its business as presently conducted and to perform its obligations under this Agreement.

11.2. Authority; Binding Effect. Each party has taken all necessary action to enter into and perform under this Agreement, and has duly authorized the officer executing this Agreement on its behalf to enter into this Agreement. This Agreement and all other agreements, documents, and instruments executed in connection herewith are and will be the valid and binding obligations of each party enforceable against such party in accordance with their respective terms, except as enforceability may be subject to bankruptcy, insolvency, receivership, moratorium, reorganization, fraudulent conveyance, equitable subordination, or similar laws of general application, and the application of equitable principles.

11.3. Absence of Conflicts. The execution and delivery of this Agreement by each party and the consummation of the transactions required hereunder: (i) do not and will not violate or conflict with any statute, regulation, judgment, order, writ, decree, or injunction

J:\SHARED\LAWYER3N\Capco re Boston Conv\Memo of Understanding (8-6-01).wpd

- 10 -

currently applicable to any party or to its properties or assets; and (ii) do not and will not violate or conflict with any existing mortgage, indenture, contract, licensing agreement, financing statement, or other agreement binding on any party or any of its subsidiaries.

## 12. Miscellaneous

12.1. Notices. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the party or to an officer of the party to whom the same is directed; or (ii) whether or not the same is actually received, if sent by registered or certified mail, postage and charges prepaid, addressed as set forth in the introductory paragraph hereof, or to such other address as the parties may from time to time specify by notice to the other parties. Any such notice shall be deemed to have been delivered, given, and received as of the date so delivered, if delivered personally, or as of the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

12.2. Binding Effect; Amendment. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof; it may be amended, from time to time, only by a written instrument executed by all of the parties.

12.3. Conflict. In the event of any conflict between the provisions of the Subcontracts and the provisions of this Agreement, the provision of this Agreement shall govern.

12.4. Assignment. No party may assign, delegate, or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of all of the parties hereto.

12.5. Waiver. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies under law.

12.6. Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

12.7. Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all of the parties had

signed the same document. All counterparts shall be construed together and shall constitute one agreement.

12.8. Amendment. No modification or amendment of this Agreement, whether in whole or in part, shall be effective unless made in writing and signed by the parties hereto.

12.9. Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Rhode Island. In any litigation connected with this Agreement, the parties hereto hereby consent to and confer jurisdiction on the courts of the State of Rhode Island, United States of America and on the United States District Court for the District of Rhode Island, and hereby expressly waive any objections to venue in any such courts. THE PARTIES HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION THEREWITH.

12.10. Exhibits and Schedules. Any exhibits or schedules annexed hereto are hereby deemed incorporated by reference into and a part hereof as if the same had been set forth verbatim herein.

12.11. Section Headings. The section and other headings set forth herein are for reference and convenience only, and do not define, limit, or extend the scope of this Agreement in any way.

12.12. Pronouns. All pronouns and any variations thereof used herein shall be deemed to refer to masculine, feminine, neuter, singular, or plural as context may require.

12.13. Recitals. Any and all recitals herein set forth are hereby deemed to be true and correct, and shall further be deemed incorporated by reference into and made a part hereof.

12.14. Further Assurances. After the date hereof, the parties hereto shall execute and deliver such further and other instruments and items as any of the parties hereto may reasonably request and as may be reasonably necessary to effectuate the transactions contemplated herein.

12.15. Attorneys' Fees. In the event that any party hereto is required to engage the services of legal counsel to enforce its rights under this Agreement against any other party hereto, regardless of whether such action results in litigation, the prevailing party shall be entitled to collect and recover reasonable attorneys' fees and costs from such other party, which in the event of litigation shall include fees and costs incurred both at trial and on appeal.

12.16. Time of the Essence. Time shall be of the essence with respect to each and every one of the various undertakings and obligations set forth herein.

J:\SHARED\LAWYER3N\Capco re Boston Conv\Memo of Understanding (8-6-01).wpd

12.17. Construction. This Agreement was negotiated and reviewed by all parties hereto and their respective legal counsel. No portion of this Agreement shall be construed against any drafting party.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the day first above set forth.

Capco Steel Corporation                    Dorel Steel Erection Corporation

By: _____               By: _____
    Patricia G. Cararco                        Name:
    President                                   Title: Vice Pres,

James F. Stearns Company                   Prime Steel Corporation

By: _____               By: _____
   Name: Ja  L Sle  1a-                        Name:
   Title:  Pre                                  Title: Vici Rancho

# EXHIBIT A

## Agreement between Canam Steel Corporation and Capco Steel Corporation

## EXHIBIT B

### Schedule of Labor, Materials, and Resources to Be Contributed
### by each of Capco, Dorel, Stearns, and Prime

J:\SHARED\LAWYERS\N\Capco re Boston Conv\Memo of Understanding (8-6-01).wpd

## EXHIBIT C

### Schedule of Compensation of Administrative Project Manager
### (Capco Steel Corporation)

## SCHEDULE 1

Capco Steel Corporation ("Capco"), Dorel Steel Erection Corporation (" Dorel"), James F. Stearns Company ("Stearns"), and Prime Steel Corporation ("Prime") hereby further agree as follows:

That Capco has entered into a subcontract with Canam Steel Corporation ("Canam") dated January 26, 2001, a copy of said subcontract is attached hereto and incorporated herein, concerning the project known as the "Boston Convention and Exhibition Center, South Boston".

That Canam has entered into a contract with Clark/Huber, Hunt & Nichols/Berry ("Clark/Huber") as construction manager. Said contract is dated October 12, 2000, a copy of which is attached hereto and incorporated herein.

That by signing the attached Memorandum of Understanding and copy of this Schedule 1, Subcontractor hereby agrees to be bound to Capco as to the same terms and conditions that Capco is bound to Canam pursuant to the aforesaid subcontract with Canam dated January 26, 2001 and that certain contract with Canam and Clark/Huber dated October 12, 2000, and all exhibits noted in the attached contracts.

That Subcontractor hereby acknowledges that it has received the aforesaid contracts and all exhibits that are attached thereto, and that all of the foregoing are hereby incorporated by reference.

That notwithstanding anything to the contrary, it is a condition precedent of any payment to be made under the Subcontracts that payment shall be made by Capco only when and if Capco receives corresponding payment from Canam.

Capco Steel Corporation                    Dorel Steel Erection Corporation

By:                                        By:
   Patricia G. Caparco                        Name:
   President                                  Title: Vice Pres.

James F. Stearns Company                   Prime Steel Corporation

By:                                        By:
   Name:                                      Name:
   Title:                                     Title:

J:\SHARED\LAWYER3N\Capco re Boston Conv\Schedule 1.wpd